UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

                                         :

UNITED STATES OF AMERICA         :

                                         :

           - v. -              :             S1 13 Cr. 513 (CS)

                                         :

MELANIE FERREIRA,            :

                                         :

                  Defendant.      :

                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for the United States of America

JASON P.W. HALPERIN
Assistant United States Attorney
    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :

UNITED STATES OF AMERICA         :
                                    :

        - v. -                 :                    S1 13 Cr. 513 (CS)
                                    :

MELANIE FERREIRA,             :
                                    :

                Defendant.     :
                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS

### <u>INTRODUCTION</u>

        The Government respectfully submits this Memorandum of Law in opposition to the pretrial motions filed by *pro se* defendant Melanie Ferreira relating to Indictment S1 13 Cr. 513 (CS) ("the Indictment") in the above-captioned case.  Ferreira has filed a battery of motions with the Court, each one being more indecipherable, baffling, and irrelevant than the next.  Among other things, the defendant moves:  to dismiss the Indictment based on concealment of National Security Agency ("NSA") records; for production of all financial records of Your Honor, the clerk of court, the United States attorney, and law enforcement agents; to dismiss based on violations of the Classified Information Procedures Act ("CIPA"); and for this Court "to make findings of fact and law on all issues presented by Defendant in this case."

        Leaving aside points that would be readily apparent to a criminal defense attorney, such as that issues relating to CIPA and the NSA have nothing to do with a wire fraud and bank fraud case, it is worth noting that in her motion asking the Court to make findings of facts and law on all issues on her behalf, Ferreira cites to Federal Rules of *Civil* Procedure 52(a) and 54(b).  Oftentimes, as it relates to Ferreira's motions, it is unclear what she means.  What is

all too clear, however, is that Ferreira would be far better served in this case if she agreed to have

an experienced criminal defense attorney represent her.  For the reasons set forth below, the

defendant's motions lack merit and should be denied.

## THE NATURE OF THE CHARGES

On April 23, 2013, Defendant Melanie Ferreira was arrested at her home in

Dutchess County, New York pursuant to a court-approved three-count Complaint charging her

with wire fraud, filing false claims with the Internal Revenue Service ("IRS"), and bank fraud, in

violation of Title 18, United States Code, Sections 1343, 287, 1344, and 2 respectively.  On July

16, 2013, the Grand Jury returned three-count Indictment 13 Cr. 513 (CS) with the same three

charges as the Complaint.  On October 10, 2013, the Grand Jury returned the four-count

Superseding Indictment S1 13 Cr. 513 (CS) ("the Indictment"), which just added Count Four,

which charged Ferreira with obstructing and impeding the due administration of the Internal

Revenue Laws, in violation of Title 26, United States Code, Section 7212(a).

As set forth in significant detail in the eight-page speaking Complaint (attached as

Exhibit A), the allegations in the Indictment focus on Ferreira's conduct in a wire fraud and tax

fraud scheme that allowed her to successfully defraud the IRS out of $440,924 and to a bank

fraud scheme in which Ferreira attempted to defraud her mortgage holder by fraudulently

satisfying the lien on her home in Dutchess County, New York.

In terms of the wire fraud and tax fraud scheme, the evidence at trial will show

that when Ferreira filed her U.S. Individual Income Tax Return, Form 1040, for tax year 2008

("2008 return") on or about October 15, 2009, Ferreira simply invented fake numbers to execute

her scheme to defraud.  Although she had paid only $236 in federal taxes for the year 2008, she

falsely claimed she had already paid $661,536 in federal taxes.  On that basis, Ferreira claimed a

refund of $440,924, which the Internal Revenue Service ("IRS") issued to her through a wire transfer to her bank on October 23, 2009.  Over the next several weeks, Ferreira made a number of wire transfers with these purloined funds and also withdrew approximately $126,900 in cash. By on or about November 3, 2009, *i.e.*, approximately 11 days after receiving the $440,924 wire transfer, Ferreira's bank account had a balance of -$94.80.  Subsequently, on April 15, 2010, when Ferreira filed her 2009 tax return, she engaged in the same fraudulent conduct, claiming a refund of $332,033, but this time, the IRS denied her claim.

The Indictment also charges Ferreira with bank fraud as it relates to her mortgage with Bank of America ("BOA").  In or about May 2010, Ferreira caused a forged cashier's check purporting to be drawn on the Federal Reserve Bank of Cleveland, Ohio ("Ferreira's Check 1") to be sent via certified mail to BOA, to satisfy Ferreira's mortgage on her home in Dutchess County ("House 1").  Ferreira caused an acquaintance in Colorado to send Ferreira's Check 1 to BOA in the amount of $316,966.05.  BOA initially filed a satisfaction of mortgage with respect to House 1 with the Dutchess County Clerk's Office on or about June 30, 2010, deeming Ferreira's Check 1 legitimate.  BOA subsequently determined that Ferreira's Check 1 was fraudulent and had to incur attorney's fees and costs to file suit in New York State Supreme Court seeking the reinstatement of the Mortgage on House 1.  The mortgage on House 1 was subsequently reinstated.

Moreover, on or about June 2, 2012, a check signed by Ferreira was mailed to BOA in the amount of $305,000 ("Ferreira's Check 2") purporting to pay off the balance of Ferreira's mortgage from BOA on House 1.  BOA records indicate that when BOA tried to negotiate Ferreira's Check 2, Ferreira's Check 2 was returned, because the originating bank account, *i.e.*, Ferreira's account at a different bank, had been closed approximately two-and-a-

half years before she wrote the $305,000 check.  In addition, BOA records and witness interviews reveal that for at least four years before Ferreira mailed Ferreira's Check 2 to BOA on or about June 2, 2012, Ferreira had made no mortgage payments for this loan, although regular monthly mortgage payments had been made to BOA by Ferreira's now ex-husband.

On Ferreira's Check 2, Ferreira wrote in red ink in the memo section, "FOR DISCHARGE OF DEBT EFT ONLY."  On the back of Ferreira's Check 2, Ferreira wrote the following, on multiple lines:

| | |
|---|---|
| [in red ink] | "NOT FOR DEPOSIT |
| | EFT ONLY |
| | FOR DISCHARGE |
| | OF DEBT" [and then in black ink:] "6/2/12" |
| | FERREIRA then signed her name in blue ink and under her name, she wrote: |
| | "Authorized Representative" |
| [in red ink:] | "WITHOUT RECOURSE" |

Ferreira sent to BOA not only Ferreira's Check 2, described above, but also, an "Affidavit of Status of Melanie Ferreira" ("Ferreira's Affidavit").  In Ferreira's Affidavit, Ferreira wrote, among other things, "Your Affiant is a living, breathing, sentient being on the land, a Natural Person, and therefore is not and cannot be any ARTIFICIAL PERSON and, therefore, is exempt from any and all identifications, treatments, and requirements as any ARTIFICIAL PERSON pursuant to any process, law, code, or statute or any color thereof."[1]

---

[1]      As set forth in the Complaint ¶ 11, both Ferreira's schemes and her many filings (both during her criminal conduct and in her court filings since she was first charged) bear the hallmarks used by members of the Sovereign Citizens Movement ("Sovereign Citizens").  The Sovereign Citizens are anti-government extremists who believe that even though they physically reside in this country, they are separate or sovereign from the United States.  As a result, many Sovereign Citizens do not believe they have to answer to any government authority, including courts, taxing entities, motor vehicle departments, or law enforcement.  For the Court's review, the Government attaches as Exhibit B several recent articles about the Sovereign Citizens.

## PROCEDURAL HISTORY

In order for the Court to have a fully detailed understanding of the procedural history of the case to date as the Court reviews Ferreira's motions, the Government provides the following narrative of the case's procedural posture.  At Ferreira's Presentment on the Complaint on April 23, 2013, Magistrate Judge Lisa Margaret Smith conducted a thorough inquiry with Ferreira, in which the Judge strongly cautioned Ferreira about her stated decision to proceed *pro se*.  *See* April 23 Tr. at 4-11.  Judge Smith warned Ferreira that she "would be required to comply with the same rules of procedure and expectations of behavior that everyone else would comply with."  *Id.* at 8.  Even though Ferreira admitted that she was not familiar with the Federal Rules of Criminal Procedure or the Federal Rules of Evidence, she insisted on representing herself.  *See id.* at 6.  At the Presentment, the Government expressed its intention to communicate with Ferreira only if standby counsel was copied on e-mails or participated in telephone conversations.  When Judge Smith asked Ferreira if she understood, she responded: "I just said I don't want to have any attorney.  I do not wish to have Ms. Brody part of this at this time."  *See* 4/23/13 PTC Tr. at 22.

Throughout the Presentment, Ferreira had difficulty understanding and accepting basic legal concepts.  For example, Ferreira argued for the return of items that were seized from her house, claiming "that's violating my Fourth Amendment rights."  Judge Smith had to explain that her Fourth Amendment rights were in fact protected when the Government obtained a search warrant from a judge.  *See id.* at 76.  Ferreira, however, pressed on with the point and then began ranting that "they didn't show me oath of office.  They didn't show me their bond," to which Judge Smith responded, "I don't know what those things are, Ms. Ferreira.  I don't know what those things are."  *Id.*  (Months later, Ferreira repeated these arguments to this Court on

6

September 17, 2013. *See* 9/17/13 PTC Tr. at 5, 17-18). At the Presentment, Ferreira also had difficulty comprehending the Complaint. After Judge Smith explained the three charges and the potential punishment (and Ferreira affirmed that she understood each charge), Ferreira then asked the court to read out loud the entire 8-page, single-spaced Complaint, which Judge Smith did.[2] *Id.* at 32-34.

On April 29, 2013, Ferreira appeared before Judge Smith for the first out of a total of three additional bail hearings, where Ferreira again displayed a clear unwillingness to accept the court's jurisdiction over her. At the start of the proceeding, Ferreira asserted that she cannot use a court-appointed attorney because "[she] would be committing perjury, since bar-carded attorneys can only represent employees or members of the agency . . . [she] cannot use a public defender, as [she] is not part of the agency." *See* 4/29/13 PTC Tr. at 4-5. After Judge Smith explained in great detail that Ferreira is in fact entitled to an attorney and further explained why and how the United States District Court for the Southern District of New York had jurisdiction over Ferreira, Ferreira stated, she "[does] not understand the jurisdiction," nor did she understand the lengthy and clear "clarification of the jurisdiction" that Judge Smith provided. *Id.* at 5-11. Even after Judge Smith thoroughly explained and concluded, "this Court has absolute jurisdiction, pursuant to the Constitution and the laws of the United States, under Title 18, United States Code, Section 3231," Ferreira continued to make nonsensical arguments. *Id.* at 7-11.[3]

Specifically, Ferreira declared she is a "natural person" and thereby "is not under this jurisdiction." *Id.* at 12-13. On numerous occasions throughout the April 29th proceeding,

---

[2] In the defendant's Affidavit of Truth and Fact of Melanie Ferreira on July 10, 2013, Ferreira admitted "Let the record reflect that the affiant answered under fear and duress in error, "Yes I understand," although your affiant never understood any of these charges." Ferreira July 10 Aff. at 63.

[3] Judge Smith went as far as providing Ferreira with cases asserting the court's jurisdiction, and even giving Ferreira a copy of the United States Constitution. *See id.* at 12-13.

Judge Smith explained to Ferreira that what Ferreira was saying did not make any sense, and that the legal arguments she was asserting were simply wrong. *See id*. at 5-8.  Furthermore, Judge Smith stressed a concern that Ferreira believed she "had no obligation to comply with the orders of this Court," and the court asked Ferreira to assure the court that she would acknowledge the court's power to set bail and comply with such conditions. *See id*. at 14, 20-31.  Only after Judge Smith preliminarily granted the Government's motion and revoked Ferreira's bail did Ferreira concede that the court had jurisdiction over her. *Id.* at 29.  At one point during this hearing, Judge Smith admonished Ferreira that she was "changing the subject, and . . . ignoring what [the Judge] asked [her]." *See* 4/29/13 PTC Tr. at 26.

In addition, before the April 29th conference, Ferreira had filed a Motion for Clarification of Jurisdiction, "asserting a **jurisdictional bar**" and claiming that she "does **not understand** (i.e. stand under the bond) the **nature** of the jurisdiction asserted against [her]." Def. Motion for Clarification of Jurisdiction Asserted at 1-2.  Judge Smith addressed this incoherent statement at the bail hearing on April 29, 2013, by saying, "That doesn't make any sense to me.  'Stand under the bond' is not what the word 'understand' means.  It's not what it means.  'Understand' means to have comprehension."  4/29/13 PTC Tr. at 8.  Ferreira also filed a Motion for a Special Emergency Hearing "for the purpose being to stay any further movement on the case until the Motion for Clarification of Jurisdiction Asserted has been clarified."  Def.'s Mot. for a Special Emergency Hearing at 1.  Judge Smith explained that she "[did not] know what most of [the motion for clarification of jurisdiction asserted] means."  4/29/13 PTC Tr. at 7.

On May 10, 2013, during the fourth bail conference in two-and-a-half weeks, Judge Smith continued to give Ferreira some additional time to attempt to meet the bail

conditions, and placed Ferreira on home detention with electronic monitoring.  *See* 5/10/13 PTC Tr. at 15.

On July 17, 2013, after a Grand Jury sitting in White Plains federal court returned a three-count Indictment 13 Cr. 513 (CS) against Ferreira, the defendant was arraigned before Magistrate Judge Paul E. Davison.  When asked to state her name for the record, Ferreira spelled out her name and said in sum and substance, "I am alive and living . . . ."[4]  When Judge Davison asked Ferreira if she read the Indictment, she said that she needed more time to read and understand it.  Judge Davison told Ferreira he would give her a moment to read the short five-page Indictment, but Ferreira insisted that she needed more time, confessing that she would need to go to a law library and use a legal dictionary to define words in the Indictment.  Ferreira then refused to enter a plea of "guilty" or "not guilty."  Ferreira refused to enter a plea even after Judge Davison explained to her that she needed to enter a plea.  Judge Davison eventually had to enter a "not guilty" plea on Ferreira's behalf.  The case was then assigned to this Court.

Later that day, at the Initial Pretrial Conference before this Court, Ferreira again asserted her mistaken belief that the District Court "definitely lacks subject matter jurisdiction," because she believes "it is not up to a judge to determine jurisdiction."  *See* 7/17/13 PTC Tr. at 9. Ferreira demonstrated her lack of understanding of courtroom procedure by her inappropriate behavior in the courtroom, including the fact that she shouted "objection" at various times throughout the pretrial conference.  The Court instructed Ferreira, "This is not a trial.  We don't have objections."  *Id*. at 7.  When Judge Seibel asked how long the Government's case at trial might take to present, the Government answered "two weeks."  *Id.* at 16-17.  When the Judge

---

[4]     While it has most of the other court transcripts, the Government does not yet have the transcript from the July 17, 2013 arraignment before Magistrate Judge Davison, so the quotations in this paragraph may not be exact.

then asked Ferreira how long any possible defense case might take, Ferreira said, "six months." *Id.* at 17.  At the July 17th pretrial conference, Ferreira also argued that she was entitled to notice of the Indictment.  *Id.* at 7, 17, 28.  Judge Seibel was quick to correct Ferreira's statement, explaining: "That's actually not correct. . . .  [The Government does not] go out and tell people who they're arresting in advance that an indictment is coming."  *Id.* at 28-29.  Ferreira expressed her inability to comprehend the Indictment, stating she needed time to read the five-page indictment and to "look up certain words to understand [it] completely."  *Id.* at 7.  Like Judge Smith had done previously, this Court strongly recommended that Ferreira consider being represented by counsel and explained the disadvantages of proceeding *pro se*.  *See id.* at 20-22. The Court explained that self-representation is "a monumentally bad idea," despite it being Ferreira's right under the law, because of the serious charges filed against her and the complicated laws she would have to understand if she proceeds *pro se*.  *Id.*  During the pretrial conference, Ferreira exclaimed, "I would be happy to have effective counsel . . . right now I am without effective assistance of counsel," but again declined appointment of counsel.  *Id.* at 23-24.

Following the July 17th pretrial conference, even after the Government had stated on the record before this Court that it would communicate with Ferreira only through letters and email (with stand-by counsel copied on all communications) or by telephone calls with standby counsel participating, Ferreira went to the U.S. Attorney's Office and asked the Government for the name and address of one of the IRS Special Agents involved in her case.  On August 1, 2013, the Government sent a letter to the Court informing the Court that Ferreira had shown up again the day before at the U.S. Attorney's Office and asked for the name of the Grand Jury foreperson who had signed the Indictment.  That same day, this Court issued an Order saying, "Ms. Ferreira

should understand that Grand Jury proceedings are secret by law, including the identity of the grand jurors." Order dated 8/1/13.

Similarly, on August 29, 2013, Ferreira sent a letter to the Clerk of Court in the White Plains federal courthouse asking for copies of the Oaths of Office of Judges Seibel, Smith, and Davison. On September 4, 2013, this Court issued an Order stating, "Ms. Ferreira is advised (although I am told that she has already been advised by personnel in the Clerk's Office) that she should request the oaths from the Administrative Office of the United States Courts in Washington, D.C." Order dated 9/4/13.

At a pretrial conference on September 17, 2013, the Court denied Ferreira's motion for return of property. *See* 9/17/13 PTC Tr. at 2. The motion argued that the Fifth Amendment prohibits illegal takings, and therefore that the Government's seizures from her home were illegal. First, the Court dismissed the defendant's argument that Public law 80-772 was passed in violation of the quorum clause. The Court explained, "as to the quorum clause, that is a claim that a lot of people raise, I don't know if they find it on the internet or what, but the Court of Appeals for the Second Circuit, as well as other courts, have found the quorum clause argument to be frivolous." *Id.* at 4. The Court also dismissed Ferreira's arguments that the search warrant the Government executed was invalid because: she had a presumption of innocence, she was indeed innocent, the warrant did not bear a seal, the affidavit supporting probable cause was not attached to the warrant, the affidavit was not based on first-hand information, and the warrant was not served *per se*. *Id.* at 6-7.

At the September 17th pre-trial conference, the Court also *sua sponte* denied Ferreira's motion to dismiss the Indictment for lack of jurisdiction, deeming the motion frivolous. *See id.* at 8. Judge Seibel explained:

11

> [T]hat motion is frivolous and is denied.  First, that the defendant may have trial
> defenses which the jury may or may not accept does not warrant dismissal of the
> Indictment before trial.  Second, the quorum clause argument is frivolous for the
> reasons stated in the cases that I've already cited, and I'm directing the defendant
> not to raise the quorum clause argument again . . . .   And, third, . . . I don't
> understand the defendant's [*Hylton*] argument which is not developed."

*Id.* at 8-9.  In response to Ferreira's challenge to Public Law 80-772 that it was passed in

violation of the quorum clause, *see* 9/17/13 PTC Tr. at 4-5, this Court, citing numerous cases,

dismissed the argument, stating:  "I'm not aware of any court that has accepted it, and I don't

know why people waste their time with it when everybody to have looked at it, every court to

have looked at it has found it to be meritless, if not frivolous."  *Id.* at 5.  In fact, Ferreira relied on

the quorum clause argument so often throughout her motions to dismiss and for return of

property that the Court had to instruct the defendant not to raise the argument again.  *Id.* at 8.

Furthermore, Ferreira also challenged the validity of the search warrant on the grounds that it did

not bear the proper seal.  This Court also dismissed this argument, stating "I am not aware of any

requirement that the search warrant bear a seal.  The defendant has not pointed to any such

authority."  *Id.* at 6.

       Ferreira also attempted to make many unsupported arguments orally during the

pre-trial conference, again challenging the Court's jurisdiction.  *Id.* at 22.  Without citing any

authority, the defendant challenged the Assistant United States Attorney's qualifications,

claiming he "has never verified that he is statutorily compliant" because Ferreira "ha[s] never

seen his oath of office. . . . his good faith surety bond. . . . [a]nd . . . his malpractice insurance."

*Id.* at 18.  In response, the Court explained that she does not "even know what [a surety bond] is"

and that "an Assistant U.S. Attorney [is] not required to have malpractice insurance."  *Id.*  In

addition, this Court directed that Ferreira make her arguments in written motions by October 15,

2013.  *Id.* at 10, 16.  Furthermore, the Court instructed Ferreira not to repeat any of the

arguments the Judge had already heard.  *Id.*  Lastly, after noting that Ferreira is "making arguments that a lot of people in [her] position who aren't lawyers make without knowing that they're frivolous under the law[,]" the Court insisted that Ferreira "reconsider [her] decision to proceed without counsel or at least . . . confer with [her] stand-by counsel."  *Id.* at 24. Throughout the September 17th pretrial conference, this Court was forced to explain to Ferreira that she cannot interrupt others by shouting "objection," that she had to raise any additional arguments in written motions, and that she cannot repeatedly rely on arguments the Court has already rejected or deemed frivolous.  *See id.* at 10, 14-15.

So too, here, Ferreira has repeatedly challenged this Court's jurisdiction and made frivolous arguments and requests of the Court and the United States Attorney's Office.  Ferreira has challenged this Court's jurisdiction on numerous occasions.  *See* 4/29/13 PTC Tr. at 4-13; 7/17/13 PTC Tr. at 9; 9/17/13 PTC Tr. at 22.  This Court responded similarly to Ferreira's argument that her indictment ought to be dismissed because a case from 1796 held that income taxes are indirect.  *See* 9/17/13 PTC Tr. at 9.  As the Court stated: "I don't understand her argument which is not developed."  *Id.*  The Court went on to cite caselaw and a constitutional amendment that invalidated Ferreira's argument.  *See id.*

On October 2, 2013, Ferreira submitted to the United States Court of Appeals for the Second Circuit a "Petition for a Common Law Writ of Mandamus and/or Prohibition."  In this petition, Ferreira claims that "[t]he District Court has abdicated the responsibility [of the alleged issue of the Court's jurisdiction] and advised [her] to go to the Court of Appeals."  *See* Mandamus Pet. at 9.  The defendant also claims that because this Court has denied all the Defendant's frivolous and incoherent motions, Judge Seibel and the Government are therefore acting in a corrupt manner:

> The Judge has also practiced law from the bench. . . .  Instead of letting the parties to the proceedings resolve the issues based on statute and law, the [C]ourt acted as a subsidiary of the DOJ, always ruling in their favor and never ruling in favor of Petitioner.  Such actions, always in favor of the DOJ, creates a presumption that the [C]ourt will do whatever the DOJ wants, regardless of the law, causing damage and harm to the Petitioner.  The actions of the [J]udge in this case were a direct violation of their [sic] oaths of office according to 28 USC section 455.

*Id.* at 11.  In her Mandamus Petition to the Second Circuit, Ferreira somehow concludes that the District Court lacks jurisdiction over her.  *See id.* at 17.

Most recently, at the arraignment on the Superseding Indictment on October 16, 2013 before Magistrate Judge Smith, when Judge Smith explained the charges in the Indictment to Ferreira, Ferreira responded by saying in sum and substance, "I don't understand any of these charges."[5]  Judge Smith again advised Ferreira to reconsider allowing learned counsel to represent her.  At this court conference, standby counsel Susanne Brody of the Federal Defenders of New York asked to be relieved.  Judge Smith granted the request and Margaret Shalley of the Criminal Justice Act panel was appointed as standby counsel.

## ARGUMENT

Because the defendant's motions lack merit, the Government respectfully requests that the Court deny all her motions.

### A.  Summary of Defendant's Motions

Because Ferreira filed so many different motions, the Government thought it might be helpful for the Court if we tried to list and summarize her motions.  Accordingly, to the extent the Government can ascertain what specific relief Ferreira seeks in each motion, she appears to have filed the following motions:

---

[5]      Since the Government has not yet received a copy of the transcript of this proceeding, this quotation may not be verbatim.

1. <u>Motion to Dismiss Indictment with Prejudice for Defective Record</u>:  Ferreira appears to argue that there is no concurrence form on the record showing there was a quorum in the grand jury and she argues that the Indictment was not presented in open court.

2. <u>Motion to Take Judicial Notice</u>:  The Government is unclear as to what Ferreira seeks with this Notice.

3. <u>Motion to Dismiss Indictment with Prejudice Based on Supporting Memorandum of Law Related to 1099 OIDS (Original Issue Discounts)</u>:  Ferreira argues that OIDs are legal and she makes a claim of a *Brady* violation, which the Government does not understand.

4. <u>Motion for the Court to Make Findings of Fact and Law on All Issues in Defendant's Case</u>:  The defendant relies on Federal Rules of *Civil* Procedure 52 and 54, claiming that if the Court does not rule on all issues of law and fact in the defendant's favor, then the defendant's due process rights will be violated.

5. <u>Motion for Dismissal of the Indictment and Charges with Prejudice Due to Concealment of NSA and FINCEN Records, in violation of the 1st, 4th, 5th, 6th Amendments of the United States</u>:  Ferreira argues that the Indictment should be dismissed because one particular blog lists President Obama and Attorney General Holder "as two of the most corrupt politicians in history."  Mot. at 4.  Moreover, in declaring that the Court must follow "his [sic] oath of office" (the incorrect pronoun underscoring the boilerplate nature of this absurd motion), Ferreira contends that "the judge in this case is clearly biased, is acting as a second prosecutor, has committed perjury of oath of office, has committed Treason to the Constitution, resulting in structural error, requiring dismissal of the case with prejudice."  Mot. at 16-17.

6. <u>Motion to Dismiss Case with Prejudice for Failure of Magistrate to Seal Warrant and Indictment</u>:  Defendant argues that there is no seal on either warrant or the Indictment and therefore it is invalid, and must therefore be dismissed.  Her argument contains no citations whatsoever.

7. <u>Motion to Take Notice of Maxims of Law</u>:  The Government is unclear as to what Ferreira's argument is.

8. <u>Motion for an Open File Policy and Production of all Records in all State and Federal Agencies</u>:  The defendant argues that because the Attorney General is supposedly corrupt, there is also a presumption that the assigned Assistant United States Attorney is corrupt.  Therefore, she continues, there must be an open file policy, under which all government documents regarding her case, from all government agencies (state and federal), must be disclosed to her.

9. <u>Motion for Production of Financial Records of Government Officials</u>:  Ferreira argues that she is entitled to inspect and review "all financial records" of Your Honor, the United States Attorney, the clerk of court, and any assigned law enforcement agents.

10. <u>Motion to Declare Search and Seizure Illegal for Failure to Serve Real Party in Interest</u>:  Citing again to the Federal Rules of *Civil* Procedure, Ferreira appears to argue that the property seized by agents pursuant to the court-approved search warrant was in a trust,

not in her name, and therefore that she should not have been served with the search warrant.

11. <u>Notice of CIPA Discovery Fraud and Motion for Dismissal of Indictment with Prejudice, or Alternatively, Production of all CIPA Records in All Agencies of the Government, Subpoenas and a CIPA Hearing</u>:  Ferreira claims to have evidence and an offer of proof that the NSA, FINCEN, and the IRS have violated her Due Process rights.  She also contends that the assigned federal prosecutor has concealed classified records (those records kept by the NSA, FINCEN, and the IRS).  Accordingly, she demands dismissal or a CIPA hearing with disclosure of all classified records in an "unredacted" form.

12. <u>Rovario Motion</u>:  Ferreira requests the identity of all informants in the case.


**B.  Discussion**[6]

   Ferreira's motions are all both baseless and frivolous.  All of them can be very easily dispatched and denied.  In addressing the list of 12 motions or notices set forth above, the Government starts by noting that for many of them, Ferreira provides no valid caselaw or statutory support.  For numbers 4 and 10 above, she cites to the Federal Rules of Civil Procedure. Not much need be written about why Ferreira is not entitled to have this Court make pretrial findings of fact and law on "all issues in defendant's case," except to say that a jury at her trial will serve as the factfinder in this criminal prosecution.

   In terms of her claim that the Government has concealed NSA and CIPA records in this case, the Government can represent that it is unaware of any classified information that pertains to this case.  In terms of Ferreira's claim that she is entitled to production of this Court's own financial records, among other things, she provides no support for that proposition and it is

---

[6]  In responding to Ferreira's motions, the Government intends to try to conserve its resources (and, more importantly, the Court's) by not spending significant time responding to motions it deems to be frivolous or ones that are perhaps pulled off of an Internet forum.  Thus, the Government does not intend to respond substantively to Ferreira's claim that she has a right to view and inspect the Court's own financial records.  If, however, there is any motion for which the Court would like a more detailed response from the Government, we would respectfully request leave to supplement this opposition brief within seven days of the date when the Court gives us such indication.

so utterly ridiculous that no more need be said.  So too, it is difficult to determine which is more preposterous:  Ferreira's claim that the President of the United States and the Attorney General are so corrupt that "Corruption now infects this case," Mot. at 15, or that this Court "is clearly biased" and "has committed perjury of oath of office." Mot. at 16-17.

Ferreira's various motions seeking dismissal of the Indictment are all meritless and ignore the fact that both this Court and Magistrate Judge Smith have already repeatedly denied her numerous motions to dismiss the charges based on an alleged lack of jurisdiction. Moreover, #6 above, in which Ferreira asks the Court to dismiss the case because the Magistrate Judge failed to apply a seal to the warrant and the Indictment, is an argument that Ferreira has already made and that this Court already rejected at the last pretrial conference on September 17, 2013.  *See* 9/17/13 PTC Tr. at 6-7.  Similarly, Ferreira cites the quorum clause in support of her argument for motion #1.  At that same September 17th conference, this Court explicitly directed Ferreira *not* to re-file any motions that the Court had already denied.  *See id*. at 10, 16.  Ferreira has now done so, and thus has violated this Court's order to the contrary.[7]

---

[7]     Because of Ferreira's violation of the Court's order and because Ferreira has repeatedly filed frivolous motions, the Government respectfully requests that the Court orders that Ferreira may not file any motions from this point forward without the prior approval of this Court to do so.

## **CONCLUSION**

For all these reasons, the Government respectfully requests that the Court deny

the defendant's pretrial motions as meritless.

Dated:          White Plains, New York
                November 4, 2013

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney

                          By:  _____
                                        Jason P.W. Halperin
                                        Assistant United States Attorney
                                        (914) 993-1933

<u>AFFIRMATION OF SERVICE</u>

JASON P.W. HALPERIN, pursuant to Title 28, United States Code, Section

1746, hereby declares under the penalty of perjury:

That I am an Assistant United States Attorney in the Office of the United States

Attorney for the Southern District of New York.

That on November 4, 2013, I caused one copy of the within Government's

Memorandum of Law in Opposition to Defendant's Pretrial Motions to be delivered by e-mail to:

Melanie Ferreira              (*Pro se* defendant)

Margaret Shalley, Esq.        (Standby Counsel for Ferreira)

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. §

1746.


_____

Jason P.W. Halperin


Dated:        White Plains, New York
              November 4, 2013

# EXHIBIT A

Approved: _____
JASON P.W. HALPERIN
Assistant United States Attorney

Before:   HONORABLE PAUL E. DAVISON
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - x

**13 MAG     986**

UNITED STATES OF AMERICA          :

        - v. -                    :

MELANIE FERREIRA,                 :

            Defendant.            :

- - - - - - - - - - - - - - - x

**SEALED COMPLAINT**

Violations of
18 U.S.C. §§ 1343, 287
1344, and 2

County of Offense:

Dutchess

SOUTHERN DISTRICT OF NEW YORK, ss.:

        ANTHONY RAUSA, JR., being duly sworn, deposes and says
that he is a Special Agent with the Federal Bureau of
Investigation, and charges as follows:

                    COUNT ONE

        From in or about early 2009 through in or about April
2010, in the Southern District of New York and elsewhere,
MELANIE FERREIRA, the defendant, willfully and knowingly, having
devised and intending to devise a scheme and artifice to
defraud, and for obtaining money and property by means of false
and fraudulent pretenses, representations, and promises,
transmitted and caused to be transmitted by means of wire,
radio, and television communication in interstate and foreign
commerce, a writing, sign, signal, picture, and sound for the
purpose of executing such scheme and artifice, to wit, FERREIRA
filed two U.S. Individual Income Tax Returns, Forms 1040, which
falsely represented that she had received hundreds of thousands
of dollars in income and on which she had had taxes withheld,
thereby obtaining from the Internal Revenue Service ("IRS") a
refund in the amount of $440,924, to which FERREIRA was not
entitled.

        (Title 18, United States Code, Sections 1343 and 2.)

COUNT TWO

From in or about early 2009 through in or about April 2010, in the Southern District of New York and elsewhere, MELANIE FERREIRA, the defendant, made and presented to the United States Treasury Department, through the IRS, claims against the United States for payment, specifically, U.S. Individual Income Tax Returns seeking refunds of taxes purportedly paid, for tax years 2008 and 2009, knowing each such claim to be false, fictitious, and fraudulent, to wit, FERREIRA submitted Form 1040s to the IRS containing false and fraudulent claims for refunds of $440,924 in tax year 2008 and $332,033 in tax year 2009.

(Title 18, United States Code, Sections 287 and 2).

COUNT THREE

From in or about 2010 through in or about June 2012, in the Southern District of New York and elsewhere, MELANIE FERREIRA, the defendant, willfully and knowingly executed and attempted to execute a scheme and artifice to defraud a financial institution and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, by means of false and fraudulent pretenses, representations and promises, to wit, FERREIRA sent a $305,000 check to Bank of America ("BOA") from a separate bank account that was closed and that contained no funds, in an effort to fraudulently satisfy the mortgage on her home in Dutchess County, New York.

(Title 18, United States Code, Sections 1344 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

1.    I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately nine years and I have personally participated in the investigation of this matter.   This affidavit is based on my conversations with other law enforcement agents and persons, and my examination of reports, records, and documents.   Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.   Where the contents of documents and the actions, statements, and conversations of

others are reported herein, they are reported in substance and in part, except where otherwise indicated.

2.   Based on my investigation, which has included reviewing documents, interviewing witnesses, and discussing this matter with other law enforcement officers, I have learned that MELANIE FERREIRA, the defendant, and her ex-husband bought a single-family house ("House 1") in Lagrangeville, New York in Dutchess County, New York in or about 2003.  The personal information for FERREIRA on the mortgage records for House 1 is the same as the personal information provided for FERREIRA on the 2008 and 2009 tax returns discussed further herein, as is the personal information provided for FERREIRA on Department of Motor Vehicles ("DMV") records.  Moreover, I have seen a photograph from the driver's license for FERREIRA.  In or about March 2012, FBI agents interviewed FERREIRA at House 1 and at the time, she provided the name "Melanie Ferreira" and gave her address as that of House 1.  The person interviewed looked substantially the same to the person in the DMV photograph for FERREIRA to the agent who interviewed her.

3.   I have reviewed records from the Internal Revenue Service ("IRS") indicating the following:

a.   On or about October 15, 2009, MELANIE FERREIRA, the defendant, filed a U.S. Individual Income Tax Return, Form 1040, for the year 2008 ("2008 Return").  In her 2008 Return, FERREIRA, listing her address as that of House 1 in Dutchess County, falsely reported interest income of $661,600 from three different banks ("Bank 1", "Bank 2", and "Bank 3").  FERREIRA then falsely claimed that she had paid taxes in the amount of $661,536 to the IRS for Tax Year 2008.  On that basis, FERREIRA claimed a refund of $440,924.  An individual who served as FERREIRA's accountant (the "Accountant") electronically filed the 2008 Return.

b.   The IRS has no document substantiating the claim that MELANIE FERREIRA, the defendant, received $661,600 in interest income from the three banks she listed on her 2008 Return.  Contrary to the information in the 2008 Return, the records received by the IRS from Bank 1, Bank 2, and Bank 3, including Forms 1099-INT, reflect that for the 2008 Tax Year, FERREIRA earned, in total, only $17 in interest income.

c.   I have reviewed records relating to Bank 1, Bank 2, and Bank 3.  Contrary to the representations on the 2008 Return of MELANIE FERREIRA, the defendant, these records show

3

that FERREIRA did not earn any interest income from Bank 1, Bank 2, and Bank 3 in the 2008 Tax Year.  In fact, according to records from Bank 1, from which FERREIRA claimed she had earned $329,000 in interest income, FERREIRA did not actually have an account at Bank 1.  Similarly, with respect to Bank 2, from which FERREIRA claimed she had earned $282,600 in interest income in the 2008 tax year, Bank 2's records establish that Bank 2 had become dormant (and stopped doing business) several years earlier and therefore that in 2008, FERREIRA did not have an account at Bank 2.  With respect to Bank 3, FERREIRA claimed $50,000 in interest income although she opened the account in or about October 2009, the same month that she filed her 2008 Return.  Moreover, Bank 3's records show that she had earned no interest income at all as of that time.

        d.    IRS records, including the Forms 1099-INT for Banks 1, 2, and 3, reflect that as of on or about October 15, 2009, when she filed her 2008 Return, MELANIE FERREIRA, the defendant, had paid only $236 in federal taxes for the year 2008.

        4.    According to bank records I have reviewed from another bank at which MELANIE FERREIRA, the defendant, had a bank account ("Bank 4"), I have learned the following:

        a.    On or about October 23, 2009, the IRS wired $440,924.00 to FERREIRA at Bank 4 in an entry entitled "US Treasury 220 Tax Refund."

        b.    On or about the same day, October 23, 2009, after she received the $440,924.00 wire transfer referenced in paragraph a, supra, FERREIRA caused three wire transfers to be sent from the Lagrangeville, New York branch of Bank 4 in the amount of $96,800.00, $88,127.20, and $44,100.00.  That same day, FERREIRA withdrew $8,800 in cash from Bank 4 from a branch in Lagrangeville, New York in Dutchess County.

        c.    Three days later, on or about October 26, 2009, FERREIRA withdrew $9,900 in cash from a Bank 4 branch in Hopewell Junction, New York in Dutchess County, and also withdrew $9,800 in cash from a Bank 4 branch in Manhattan.  That same day, FERREIRA obtained an official bank check drawn on her account at Bank 4's Hopewell Junction branch in the amount of $160,000.00.  FERREIRA then deposited that check into an account held in her name at Bank 3.  FERREIRA then made numerous cash

withdrawals from Bank 3, all under $10,000, over the next several weeks.  In total, FERREIRA withdrew approximately $126,900 in cash.

        d.    By on or about November 3, 2009, i.e., approximately 11 days after receiving the $440,924.00 wire transfer, FERREIRA's Bank 4 account had a balance of -$94.80. Similarly, by on or about December 3, 2009, FERREIRA's Bank 3 account was virtually depleted.

        5.    I have reviewed records from the Internal Revenue Service ("IRS") indicating the following:

        a.    On or about April 15, 2010, the 2009 U.S. Individual Income Tax Return, Form 1040 ("2009 Return") of MELANIE FERREIRA, the defendant, was electronically filed.  In her 2009 Return, FERREIRA falsely reported interest income of $495,232 from Bank 3, Bank 4, and another bank ("Bank 5"). FERREIRA then falsely claimed that she had paid taxes in the amount of $494,951 to the IRS for Tax Year 2009.  On that basis, FERREIRA claimed she was entitled to a refund of $332,033.  The Accountant electronically filed FERREIRA's 2009 Return.

        b.    The IRS has no record at all showing that MELANIE FERREIRA, the defendant, ever received $495,081 in interest income from Bank 3, Bank 4, and Bank 5, collectively, as represented on her 2009 Return.  Contrary to the information in the 2009 Return, the records received by the IRS from Bank 3, Bank 4, and Bank 5, including Forms 1099-INT, reflect that for the 2009 Tax Year, FERREIRA earned only $126 in interest income.

        c.    I have reviewed records from the Bank 3, Bank 4, and Bank 5, which indicate that MELANIE FERREIRA, the defendant, did not earn the amount of interest income from these three banks that she claimed for the 2009 Tax Year.  For Bank 3, FERREIRA claimed to have earned $50,000 in interest income, when, in fact, she had earned $0 in interest income.  For Bank 4, FERREIRA claimed to have earned $445,082 in interest income, when, in fact, she had earned only $1 in interest income from Bank 4.

        d.    IRS records reflect that as of on or about April 15, 2010, when she filed her 2009 Return, MELANIE FERREIRA, the defendant, had paid only $70 in federal taxes for the 2009 tax year.

6.    IRS records show that the IRS did not issue any tax refund to MELANIE FERREIRA, the defendant, on her 2009 Return.

7.    Based on additional documents I have reviewed, including BOA documents, in or about May 2010, FERREIRA caused a forged cashier's check purporting to be drawn on the Federal Reserve Bank of Cleveland, Ohio ("FERREIRA's Check 1") to be sent via certified mail to BOA, to satisfy FERREIRA's mortgage on House 1.  FERREIRA caused an acquaintance in Colorado to send FERREIRA's Check 1 to BOA in the amount of $316,966.05.  BOA initially filed a satisfaction of mortgage with respect to House 1 with the Dutchess County Clerk's Office on or about June 30, 2010, deeming FERREIRA's Check 1 legitimate.  BOA subsequently determined that FERREIRA's Check 1 was fraudulent and filed suit in New York State Supreme Court seeking the reinstatement of the Mortgage on House 1.  The mortgage on House 1 was subsequently reinstated.

8.    I have also reviewed records from BOA that demonstrate that on or about June 2, 2012, a check signed by MELANIE FERREIRA, the defendant, was mailed to BOA in the amount of $305,000 ("FERREIRA's Check 2") purporting to pay off the balance of FERREIRA's mortgage from BOA on House 1 in Dutchess County.  BOA records indicate that when BOA tried to negotiate FERREIRA's Check 2, FERREIRA's Check 2 was returned, because the originating bank account, i.e., FERREIRA's account at Bank 4, was closed.  In addition, I have learned from reviewing BOA records and from interviewing witnesses that for at least four years before FERREIRA mailed FERREIRA's Check 2 to BOA on or about June 2, 2012, FERREIRA had made no mortgage payments for this loan, although regular monthly mortgage payments had been made to BOA by FERREIRA's now ex-husband.  Moreover, I have learned from reviewing BOA records and from interviewing witnesses that FERREIRA has not made any other mortgage payments for this loan since she mailed FERREIRA's Check 2 to BOA on or about June 2, 2012.

9.    I have obtained the original of FERREIRA's Check 2 from Bank 4.  On FERREIRA's Check 2, MELANIE FERREIRA, the defendant, wrote in red ink in the memo section, "FOR DISCHARGE OF DEBT EFT ONLY."  On the back of FERREIRA's Check 2, FERREIRA wrote the following, on multiple lines:

[in red ink]     "NOT FOR DEPOSIT
                 EFT ONLY
                 FOR DISCHARGE

OF DEBT" [and then in black ink:] "6/2/12"
FERREIRA then signed her name in blue ink and
under her name, she wrote:
"Authorized Representative"
[in red ink:]    "WITHOUT RECOURSE"

FERREIRA sent to BOA not only FERREIRA's Check 2, described
above, but also, an "Affidavit of Status of Melanie Ferreira"
("FERREIRA's Affidavit").  In FERREIRA's Affidavit, in which she
listed her address as that of House 1, FERREIRA wrote, among
other things, "Your Affiant is a living, breathing, sentient
being on the land, a Natural Person, and therefore is not and
cannot be any ARTIFICIAL PERSON and, therefore, is exempt from
any and all identifications, treatments, and requirements as any
ARTIFICIAL PERSON pursuant to any process, law, code, or statute
or any color thereof."

          10.   According to bank records I have reviewed,
FERREIRA was the only account holder for the account at Bank 4.
On or about June 4, 2005, FERREIRA opened her account at Bank 4
in her own name, and used the address for House 1.  Records from
Bank 4 indicate that FERREIRA closed her account at Bank 4 on or
about December 14, 2009, i.e., approximately two-and-a-half
years before she wrote the $305,000 check from Bank 4 to attempt
to fraudulently pay off her mortgage from BOA on House 1.

          11.   Based on: (a) my review of FERREIRA's Check 1,
(b) my review of FERREIRA's Check 2 and FERREIRA's Affidavit,
(c) my review of other documents created and sent by MELANIE
FERREIRA, the defendant, (d) my discussions with witnesses and
other agents, and (e) my training and experience, I believe that
FERREIRA is using a well-known electronic funds transfer ("EFT")
scheme often used by members of the Sovereign Citizens Movement
("Sovereign Citizens").  Based on my training and experience, I
know that the scheme usually works as follows: individuals use a
closed bank account in the individual's true name to "set off,"
or discharge debt using a check from a closed bank account, in
an effort to falsely persuade the bank that the mortgage or debt
has been satisfied.  Individuals employing such schemes
typically state, in the memo line of the check, "EFT Only for
Discharge of Debt" or "Not for Deposit For EFT Only for
Discharge of Debt," or words to that effect.  The back of the
check contains language such as "Do Not Deposit; EFT Only; For
Discharge of Debt" and "Authorized Representative Without
Recourse."  In addition to mailing the check to a financial
institution or lending company, individuals may also include
fraudulent documents such as an Affidavit of Notary

7

Presentment/Affidavit of Notary Certificate of Service or a Notice of Acceptance.  Generally, based on my training and experience, I know that the Sovereign Citizens are generally anti-government extremists who believe that even though they physically reside in this country, they are separate or sovereign from the United States.  As a result, many Sovereign Citizens do not believe they have to answer to any government authority, including courts, taxing entities, motor vehicle departments, or law enforcement.

12.   I have reviewed records from BOA indicating that at all times relevant to this Complaint, BOA was FDIC-insured.

WHEREFORE, deponent prays that a warrant be issued for the arrest of MELANIE FERREIRA, the defendant, and that she be arrested and imprisoned or bailed, as the case may be.

_____
ANTHONY RAUSA, JR.
Special Agent
Federal Bureau of Investigation


Sworn to before me this
16 day of April 2013

_____
THE HONORABLE PAUL E. DAVISON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

8

# EXHIBIT B

Filed 11/05/13   Page 30 of 41

# The New York Times

August 23, 2013

# In Paper War, Flood of Liens Is the Weapon

**By ERICA GOODE**

MINNEAPOLIS — One of the first inklings Sheriff Richard Stanek had that something was wrong came with a call from the mortgage company handling his refinancing.

"It must be a mistake," he said, when the loan officer told him that someone had placed liens totaling more than $25 million on his house and on other properties he owned.

But as Sheriff Stanek soon learned, the liens, legal claims on property to secure the payment of a debt, were just the earliest salvos in a war of paper, waged by a couple who had lost their home to foreclosure in 2009 — a tactic that, with the spread of an anti-government ideology known as the "sovereign citizen" movement, is being employed more frequently as a way to retaliate against perceived injustices.

Over the next three years, the couple, Thomas and Lisa Eilertson, filed more than $250 billion in liens, demands for compensatory damages and other claims against more than a dozen people, including the sheriff, county attorneys, the Hennepin County registrar of titles and other court officials.

"It affects your credit rating, it affected my wife, it affected my children," Sheriff Stanek said of the liens. "We spent countless hours trying to undo it."

Cases involving sovereign citizens are surfacing increasingly here in Minnesota and in other states, posing a challenge to law enforcement officers and court officials, who often become aware of the movement — a loose network of groups and individuals who do not recognize

the authority of federal, state or municipal government — only when they become targets. Although the filing of liens for outrageous sums or other seemingly frivolous claims might appear laughable, dealing with them can be nightmarish, so much so that the F.B.I. has labeled the strategy "paper terrorism." A lien can be filed by anyone under the Uniform Commercial Code.

Occasionally, people who identify with the movement have erupted into violence. In Las Vegas this week, the police said that an undercover sting operation stopped a plot to torture and kill police officers in order to bring attention to the movement. Two people were arrested. In 2010, two police officers in Arkansas were killed while conducting a traffic stop with a father and son involved in the movement.

Mostly, though, sovereign citizens choose paper as their weapon. In Gadsden, Ala., three people were arrested in July for filing liens against victims including the local district attorney and Treasury Secretary Jacob J. Lew. And in Illinois this month, a woman who, like most sovereign citizens, chose to represent herself in court, confounded a federal judge by asking him to rule on a flurry of unintelligible motions.

"I hesitate to rank your statements in order of just how bizarre they are," the judge told the woman, who was facing charges of filing billions of dollars in false liens.

"The convergence of the evidence strongly suggests a movement that is flourishing," said Mark Pitcavage, the director of investigative research for the Anti-Defamation League. "It is present in every single state in the country."

The sovereign citizen movement traces its roots to white extremist groups like the Posse Comitatus of the 1970s, and the militia movement. Terry L. Nichols, the Oklahoma City bombing conspirator, counted himself a sovereign citizen. But in recent years it has drawn from a much wider demographic, including blacks, members of Moorish sects and young Occupy protesters, said Daryl

Case Flood-00513c05 ISoocumeapon-Filed 1/03/13 Page 32 of 41

Johnson, an expert on domestic terrorism who has worked as an intelligence analyst for several federal agencies. .

The ideology seems to attract con artists, the financially desperate and people who are fed up with bureaucracy, Mr. Pitcavage said, adding, "But we've seen airline pilots, we've seen federal law enforcement officers, we've seen city councilmen and millionaires get involved with this movement."

Sovereign citizens believe that in the 1800s, the federal government was gradually subverted and replaced by an illegitimate government. They create their own driver's licenses and include their thumbprints on documents to distinguish their flesh and blood person from a "straw man" persona that they say has been created by the false government. When writing their names, they often add punctuation marks like colons or hyphens.

Adherents to the movement have been involved in a host of debt evasion schemes and mortgage and tax frauds. Two were convicted in Cleveland recently for collecting $8 million in fraudulent tax refunds from the I.R.S. And in March, Tim Turner, the leader of one large group, the Republic for the united States of America, was sentenced in Alabama to 18 years in federal prison. (His group does not capitalize the first letter in united.)

Sovereign citizens who file creditor claims are helped by the fact that in most states, the secretary of state must accept any lien that is filed without judging its validity.

The National Association of Secretaries of State released a report in April on sovereign citizens, urging state officials to find ways to expedite the removal of liens and increase penalties for fraudulent filings. More than a dozen states have enacted laws giving state filing offices more discretion in accepting liens, and an increasing number of states have passed or are considering legislation to toughen the penalties for bogus filings.

Case 1:03-cv-00543-US Document 40 Filed 7/03/13 Page 33 of 41

The Eilertsons, who were charged with 47 counts of fraudulent filing and sentenced in June to 23 months in prison, were prosecuted under a Minnesota law that makes it a felony to file fraudulent documents to retaliate against officials. John Ristad, an assistant Ramsey County attorney who handled the case, said he believed the Eilertsons were the first offenders to be prosecuted under the law. "It got me angry," he said, "because at the end of the day, these two are bullies who think they can get their way by filing paper."

The liens were filed against houses, vehicles and even mineral rights. In an affidavit, the Hennepin County examiner of titles said that in a conversation with the Eilertsons about their foreclosure, one of them told her, "We're gonna have to lien ya." The examiner later found that a lien for more than $5.1 million had been placed on her property.

If the purpose was to instill trepidation, it worked. Several county and state officials said in interviews that they worried that they might once again find themselves in the crosshairs. One state employee said it was scarier to engage with offenders who used sovereign citizen tactics than with murderers, given the prospect of facing lawsuits or fouled credit ratings.

Like many who identify with the ideology, the Eilertsons learned the techniques of document filing online from one of many sovereign citizen "gurus" who offer instruction or seminars around the country.

In hours of recorded conversation found by the authorities on their computer, the Eilertsons consulted with a man identified on the recordings as Paul Kappel, learning what he called "death by a thousand paper cuts."

Mr. Eilertson, interviewed at the state prison in Bayport, Minn., denied being anti-government or belonging to any movement. But he was familiar with the names of some figures associated with sovereign citizen teachings, including an activist named David Wynn Miller, who Mr. Eilertson said was "ahead of his time." (Mr. Miller writes his name as David-Wynn: Miller.)

Case 1:09-cv-00543-CS Document 200 Filed 11/08/13 Page 34 of 41

Mr. Eilertson, who had no previous criminal record, said his actions were an effort to fight back against corrupt banks that had handed off the couple's mortgage time after time and whose top executives never faced consequences for their actions.

"It seemed like we were being attacked every day," he said. "We needed some way to stop the foreclosure.

"We tried to do our part with as much information as we had available," he said, though he conceded that "it kind of got out of control eventually."

*This article has been revised to reflect the following correction:*

**Correction: August 29, 2013**

*An article on Saturday about an antigovernment "sovereign citizen" movement that uses fraudulent lien filings to retaliate against local officials attributed a statement about the movement erroneously. It was Daryl Johnson, an expert on domestic terrorism — not Detective Moe Greenberg of the Baltimore County Police Department — who said that in recent years the movement has drawn from a much wider demographic, including blacks, members of Moorish sects and young Occupy protesters.*

# KAALtv.com

## 5 EYEWITNESS NEWS Investigates Growing 'Sovereign Citizen' Movement

Posted at: 10/31/2013 7:28 PM
Updated at: 11/01/2013 9:05 AM
By: Stephen Tellier

They don't recognize the government. The FBI labels them domestic terrorists. And now, the Hennepin County Sheriff has identified them as the number one threat to local law enforcement.

They call themselves sovereign citizens, and 5 EYEWITNESS NEWS is taking you inside their rapidly growing movement.

Sovereign citizens believe the current federal government is illegitimate and illegal. Experts estimate there are about 300,000 sovereigns in the U.S., with 100,000 of them described as "hardcore" members. Experts said their numbers are rising, and so are concerns for local officers.

He writes his name in all lowercase: "thomas-alan;friend." He adds ARR, "All Rights Reserved," and a red thumbprint. That's how Thomas Friend signed dozens of documents he filed in the past year while fighting felony attempted theft charges in Anoka County.

In hundreds of pages, Friend stated he, "is not a United States citizen," and "is not a corporate person," "but is a sovereign American national," a "natural physical being."

These are all hallmarks of sovereign citizens.

Friend declined to speak on camera, and we spent months trying to find a sovereign who would. Only one agreed.

Randy Hudson lives in a typical home on a typical street in a typical town of 4,700 people -- Luverne, Minn. But his views are anything but typical.

He said he believes all Americans are essentially corporate entities, that all Americans are enslaved in some way, and that some folks may be afraid of him because of his beliefs.

Sovereigns like Hudson believe America has been transformed from a republic into a democracy, shifting from self-government to a dictatorship, and from God's common law to unconstitutional statutory law.

"Over a period of 150 years, we have slowly lost all our rights," Hudson said.

They trace the change to an obscure law passed in 1871, which created the municipal government of Washington, D.C. But sovereigns believe it had a deeper, sinister purpose.

"In 1871, the government was turned into a corporation," Hudson said.

That leads to perhaps their most bizarre belief -- that the federal government has sold its citizens to investors, and holds a secret bank account in the name of every American, with millions of dollars in each one.

"They're traded on the stock market the same as you and I are," Hudson said.

Hudson said he knows how this sounds.

"They think we're crazy, or they say there's absolutely no way this could be true," Hudson said.

But one look online shows he is far from alone.

"This is a movement that is spreading, and spreading rapidly," said Mark Potok, a senior fellow at the Southern Poverty Law Center, a civil rights group.

Potok is an expert on domestic extremists, including sovereign citizens.

"It is a movement that tells its adherents that everything the government says is false, that the government is secretly holding your dollars that you have a right to, and so it inculcates in its adherents an extreme kind of disrespect for the law," Potok said.

He said that endangers those who uphold the law.

"They see the law enforcement official as an enemy who is lying to them, who is engaged in a gigantic conspiracy to deprive them of their rights," Potok said.

In 2010, father and son sovereign citizens murdered two police officers during a traffic stop in Arkansas. Last year, the FBI warned sovereigns are increasingly, "attempting to harass and intimidate law enforcement." In August, two sovereigns were arrested in Las Vegas for allegedly plotting to torture and kill police officers.

"We've seen quite a bit of violence come out of this movement, and I have no doubt that we will see more," Potok said.

"If you ask us what's the biggest concern facing us today in terms of a threat, it is sovereign citizen groups and movements across this country," said Hennepin County Sheriff Richard Stanek.

Stanek has a long list of concerns. He puts the sovereign citizen movement at the top.

"Our encounters with sovereign citizens are becoming increasingly more violent," Stanek said.

"They're people that don't believe in the government, the legitimacy of the government," said Dep. Chad Christopherson with the Hennepin County Sheriff's Office.

We rode along with Christopherson as he made the rounds serving civil papers. Officers often come across sovereigns during such routine encounters.

Christopherson said some pepper him with personal or politically-charged questions. Another scrawled threats inside a foreclosed home.

"They had spray-painted things on the walls, calling the sheriff an oath breaker," Christopherson said.

Then, there is so-called "paper terrorism," a popular sovereign tactic targeting the courts. Some, like Thomas Friend, flood the system with filings. Others are more confrontational. Thomas and Lisa Eilertson were sentenced to 23 months in prison in June after filing billions of dollars in property liens against everyone involved the foreclosure of their home, including Stanek himself.

"They came out to my residence, my personal residence, and confronted my family," Stanek said.

Stanek said he worries about an increasingly confrontational minority of sovereign citizens resorting to violence.

As for Hudson, he counts himself among the majority.

"We get linked to the sovereign groups that are out killing people, breaking the law, trying to get what they want through force, and I don't condone it, and anybody that their heart's into this will not condone violence," Hudson said.

He said he's pushing for change through education.

"That's all we're asking, is for the people to look at the Constitution and read it. We're not saying, 'Pick up a gun and let's overthrow the government,' because it isn't going to happen," Hudson said.

But hundreds of thousands are hoping one day, it will.

"There might be a day, someday, that maybe we'll get a republic form of government back," Hudson said.

The sovereign citizen movement has spawned a kind of national shadow government, the Republic for the United States of America, which even elects its own president and state representatives. Hudson served as Minnesota's lieutenant governor in that organization, but stepped down last year, saying there was too much infighting to be productive.

Click here for information from SPLC. Click here to view a "hate map."

 **salon.com**

http://www.salon.com/2013/06/04/antigovernment_activist_goes_to_jail_for_wasting_the_governments_time_partner/

TUESDAY, JUN 4, 2013 3:02 PM UTC

# Antigovernment activist jailed for wasting the government's time

**A Seattle court uses a new federal law to sentence a "sovereign citizen" to 10 years for filing a false lien**

BY BILL MORLIN



*This article was originally published by* <u>The Southern Poverty Law Center</u>.



Even the steel doors and isolation of a federal prison can't seem to stop some antigovernment "sovereign citizens" from continuing to file frivolous legal documents and liens against government officials and judges.

But, as a recent case in Seattle shows, a relatively new federal law is being used by prosecutors to punish inmates and other conspirators who believe they don't answer to authority and continue to flood the legal system with spurious documents.

David Carroll Stephenson, 57, formerly of Tacoma, Wash., was sentenced last week in Seattle after being convicted by a jury of filing false liens against the director of the federal Bureau of Prisons and the warden at the Federal Correctional Institution in Phoenix.

"He is, in my mind, a very dangerous man," U.S. District Judge Ronald B. Leighton said of Stephenson, exceeding the recommended guideline range and sentencing the long-time antigovernment activist to 10 more years in prison.

Stephenson conspired with Kenneth Wayne Leaming, 57, of Spanaway, Wash., to file the fraudulent liens while Stephenson was in prison – serving an eight-year sentence at the federal prison in Phoenix for tax fraud, according to trial testimony.

Written correspondence, E-mails and telephone calls between the two antigovernment activists, who knew their conversations were being recorded because one of them was in prison, were used to convict them during the jury trial earlier this year. Stephenson, authorities say, got some of his documents mailed out of the prison by marking them as "legal mail."

The judge told Stephenson he "will not live his life without doing harm to others" and, therefore, needs to be in prison.

The judge told the self-described sovereign citizen that he is a "master manipulator, the puppeteer" and a "very dangerous man" who has been at the center of a large group of sovereign citizens in western Washington.

Leaming was convicted of three counts of filing false liens against federal officials, one count of harboring federal fugitives and of being a felon in possession of firearms.

During a Nov. 21, 2011, search of Leaming's Pierce County, Wash., home, federal agents found a number of weapons, including an AK-47 assault rifle with a bayonet; two rifles, a shotgun and several handguns, one of which was in a desk drawer near where Leaming was sitting as agents entered.

Agents also discovered Leaming had been drafting and mailing various claims and liens against a postal inspector based in Arkansas, who was investigating and prosecuting a federal fraud case against two other antigovernment activists, Timothy Donavan and Sharon Henningson. The two federal fugitives were arrested when they were found hiding at Leaming's residence.

During the investigation, court documents say agents learned that Leaming was preparing and using "false and fictitious financial instruments" and used those deposits to pay for lien-filing charges. His bogus financial instruments – called "Bonded Promissory Notes" and purportedly issued by the Federal Reserve or the U.S. Treasury – are similar to those fraudulent financial instruments counterfeited by the <u>Montana Freemen</u> at that group's training camp near Jordan, Mont., in the mid-1990s.

Court documents say one of those phony promissory notes in the amount of $1 million actually was deposited by Leaming in the U.S. Bank account of an entity controlled by Leaming. The bank briefly credited Leaming's account in the amount of $31,350, before realizing the amount was wholly fictitious and reversing the credit, court documents say.

With that antigovernment history, the judge told Leaming he "flaunts authority (and) harasses law-abiding people who have an obligation to the people to serve."

U.S. Attorney Jenny A. Durkan said the two men "tried to mask their crimes with the cloak of free speech and beliefs.

"They thought they were immune from the law or the justice system, but now their frauds aimed at taxpayers and public servants need to come to an end," the U.S. attorney said. The lengthy prison sentences the two men received "is the best way to protect the public from their schemes."

Assistant U.S. Attorney Vince Lombardi, who prosecuted the case, said Stephenson and Leaming were affiliated with a larger group of sovereign citizens, with connections throughout the United States.

Leaming was known to federal law enforcement because of his 2005 conviction for operating an aircraft without a pilot's license.

"Leaming was also a long-time constitutionalist/sovereign citizen, who had a documented history of holding himself out as a law enforcement officer and/or a lawyer," court documents say, and he was instrumental in founding the "County Rangers," the sovereign group's armed enforcement wing.

"Members of the County Rangers were issued realistic-looking badges and credentials and were required to possess firearms as part of their duties, and held themselves out as law enforcement agents," according to court documents.

The federal investigation was launched after local law enforcement agencies in western Washington told the FBI that they "had received a significant number of threats from members of this group."

"Members of this group often engaged in so-called 'freedom driving,' (that is) driving about without state-required licenses, either for their vehicles or themselves," Lombardi said in one legal filing.

When contacted by local law enforcement, members of the antigovernment group "would bombard local officials — from police officers, to local judges, to mayors and other members of local government — with frivolous liens, false claims, and sometimes threats of violence," Lombardi said.

"Many members of this same group had previously come to the attention of federal law enforcement for engaging in various fraudulent tax schemes, wire fraud schemes, and (occasionally) inappropriate communications with various members of federal law enforcement and the judiciary," Lombardi said.

"The unifying thread in all of these incidents was the same – a purported belief that both state and federal government entities were illegitimate," the prosecutor said.

The new federal anti-intimidation law intended to thwart frivolous filings was enacted in 2008. The first time it was used was in a 2010 prosecution in Minneapolis against Daniel E. Petersen, an original member of the Montana Freemen.

He was arrested in 1996 after FBI agents attempted to raid the group's training compound near Jordan, Mont. That triggered an 81-day standoff between FBI agents and the antigovernment extremists – the longest such siege in U.S. history.

While serving his federal prison sentence in Minnesota, Petersen wrote and filed false liens or encumbrances against a federal judge. Petersen was convicted of six counts and sentenced in 2010 to an additional seven-and-a-half years in prison. Now 70, he is scheduled to be released on Oct. 30, 2015.

Copyright © 2011 Salon.com. All rights reserved.